Ex. B

SCHEDULE
to the
2002 MASTER AGREEMENT

dated as of June 1, 2007

between

JPMORGAN CHASE BANK,           and           HOSTWAY CORPORATION
NATIONAL ASSOCIATION                                    ("Party B")
      ("Party A")

PART 1
Termination Provisions

(1)  "**Specified Entity**" means, in relation to Party A, for the purpose of:

   Section 5(a)(v), none;
   Section 5(a)(vi), none;
   Section 5(a)(vii), none; and
   Section 5(b)(v), none;

   and, in relation to Party B, for the purpose of:

   Section 5(a)(v), any Affiliate of Party B;
   Section 5(a)(vi), none;
   Section 5(a)(vii), none; and
   Section 5(b)(v), none.

(2)  "**Specified Transaction**" will have the meaning specified in Section 14 of this Agreement.

(3)  The "**Cross-Default**" provisions of Section 5(a)(vi) of this Agreement will not apply to Party A and will apply to Party B, and any applicable Specified Entity of Party B, with respect thereto, "Specified Indebtedness" will have the meaning specified in Section 14 of this Agreement and "Threshold Amount" will mean $250,000.

(4)  The "**Credit Event Upon Merger**" provisions of Section 5(b)(v) will not apply to Party A and will apply to Party B, and any applicable Specified Entity of Party B

(5)  The "**Automatic Early Termination**" provision of Section 6(a) will not apply to Party A or Party B.

(6)  "**Termination Currency**" will have the meaning set forth in Section 14 of this Agreement.

(7) **Additional Termination Event.** It shall be an Additional Termination Event hereunder with respect to Party B as the Affected Party if at any time: (i) an Event of Default (however described) occurs under the Loan Agreement (hereinafter defined); or (ii) the Loan Agreement shall be paid or prepaid in full, expire, terminate or otherwise cease to be in full force and effect.

(8) **Additional Condition Precedent.** For the purposes of Section 2(a)(iii) it shall be a condition precedent that no Additional Termination Event with respect to such party shall have occurred and be continuing.

## PART 2
### Tax Representations

For the purpose of Section 3(f) of this Agreement:

(i) Party A and Party B each represent, respectively, that it is a United States Person for U.S. federal income tax purposes and either (a) is a financial institution or (b) is not acting as an agent for a person that is not a United States Person for U.S. federal income tax purposes.

(ii) Party B represents in respect of each Transaction where Party A's Office for the Transaction is not located in the United States of America:

Party B is fully eligible for the benefits of the "Business Profits" or "Industrial and Commercial Profits" provision, as the case may be, the "Interest" provision and the "Other Income" provision (if any) of the income tax treaty (if any), in effect between the jurisdiction of Party A's Office for the Transaction and the United States of America with respect to any payment described in such provisions and received or to be received by it in connection with this Agreement and no such payment is attributable to a trade or business carried on by it through a permanent establishment in the jurisdiction through which Party A has entered the relevant Transaction.

## PART 3
### Agreement to Deliver Documents

For the purpose of Sections 4(a)(i) and 4(a)(ii) of this Agreement, each party agrees to deliver the following documents:

(a) Tax forms, documents or certificates to be delivered are:

Party B agrees to deliver a complete and accurate United States Internal Revenue Service Form W-9 (or any applicable successor form), in a manner reasonably satisfactory to Party A, (i) upon execution of this Agreement; (ii) promptly upon reasonable demand of Party A, and (iii) promptly upon learning that any such form previously provided by Party B has become obsolete or incorrect (and each such form is hereby identified for purposes of Section 3(d) of this Agreement).

2

(b) Other documents to be delivered are:

| Party required to deliver document | Form/Document/ Certificate | Date by which to be delivered | Covered by Section 3(d) Representation |
|---|---|---|---|
| Party B | Copies of the financial statements and reports outlined in Section 5.1 (a), (b) and (c) of the Loan Agreement | In accordance with the applicable delivery dates set forth in Section 5.1 (a), (b) and (c) of the Loan Agreement | Yes |
| Party B | Certified copies of all corporate authorizations and any other documents with respect to the execution, delivery and performance of this Agreement | Upon execution and delivery of this Agreement | Yes |
| Party A and Party B | Certificate of authority and specimen signatures of individuals executing this Agreement, Confirmations and each Credit Support Document (as applicable) | Upon execution and delivery of this Agreement and thereafter upon request of the other party | Yes |

3



# PART 4
## Miscellaneous

(1)  **Addresses for Notices.** For the purpose of Section 12(a) of this Agreement:

Address for notice or communications to Party A:

Any notice relating to a particular Transaction shall be delivered to the address or facsimile number specified in the Confirmation of such Transaction. Any notice delivered for purposes of Sections 5 and 6 of this Agreement shall be delivered to the following address:

JPMorgan Chase Bank, National Association
Attention: Legal Department- Derivatives Practice Group
270 Park Avenue, 41st Floor
New York, New York 10017-2070
Facsimile No.: (212) 270-3625

Address for delivery of financial statements and reports to Party A:

JPMorgan Chase Bank, National Association
Middle Market Banking
Attention: Curtis Reed
120 S. LaSalle Street, 2nd Floor
Chicago, IL 60603-3403

Address for notice or communications to Party B:

Hostway Corporation
Attention: Lucas Roh
Mail Code IL1-1210
One North State Street, 2nd Floor
Chicago, IL 60602
Telephone No.: (312) 236-2132
Facsimile No.: _____

(2)  **Process Agent.** For the purpose of Section 13(c) of this Agreement:

Party A appoints as its Process Agent: Not applicable.
Party B appoints as its Process Agent: Not applicable.

(3)  **Offices.** The provisions of Section 10(a) will apply to this Agreement.

(4)  **Multibranch Party.** For the purpose of Section 10 of this Agreement:

Party A is a Multibranch Party and may act through any Office specified in a Confirmation.

Party B is not a Multibranch Party.

(5) <u>Credit Support Document</u>. With respect to Party A does not apply, and with respect to Party B does not apply.

(6) <u>Credit Support Provider</u>. With respect to Party A does not apply, and with respect to Party B does not apply.

(7) <u>Governing Law</u>. This Agreement will be governed by and construed in accordance with the laws of the State of New York (without reference to choice of law doctrine).

(8) <u>Netting of Payments</u>. "Multiple Transaction Payment Netting" will apply for the purpose of Section 2(c) of this Agreement to all Transactions starting from the date of this Agreement.

(9) <u>Absence of Litigation</u>. For the purpose of Section 3(c) of this Agreement:

"Specified Entity" means, in relation to Party A, any Affiliate of Party A.
"Specified Entity" means, in relation to Party B, any Affiliate of Party B.

(10) <u>No Agency</u>. The provisions of Section 3(g) of this Agreement will apply to this Agreement.

(11) <u>Additional Representation</u> will apply. For the purpose of Section 3 of this Agreement, the following will each constitute an Additional Representation:

(h) Relationship Between Parties. Each party will be deemed to represent to the other party on the date on which it enters into a Transaction that (absent a written agreement between the parties that expressly imposes affirmative obligations to the contrary for that Transaction):

(i) Non-Reliance. It is acting for its own account, and it has made its own independent decisions to enter into that Transaction and as to whether that Transaction is appropriate or proper for it based upon its own judgment and upon advice from such advisers as it has deemed necessary. It is not relying on any communication (written or oral) of the other party as investment advice or as a recommendation to enter into that Transaction, it being understood that information and explanations related to the terms and conditions of a Transaction will not be considered investment advice or a recommendation to enter into that Transaction. No communication (written or oral) received from the other party will be deemed to be an assurance or guarantee as to the expected results of that Transaction.

(ii) Assessment and Understanding. It is capable of assessing the merits of and understanding (on its own behalf or through independent professional advice), and understands and accepts, the terms, conditions and risks of that Transaction. It is also capable of assuming, and assumes, the risks of that Transaction.

(iii) Status of Parties. The other party is not acting as a fiduciary for or an adviser to it in respect of that Transaction.

(iv) **Other Transactions.** It understands and acknowledges that the other party may, either in connection with entering into a Transaction or from time to time thereafter, engage in open market transactions that are designed to hedge or reduce the risks incurred by it in connection with such Transaction and that the effect of such open market transactions may be to affect or reduce the value of such Transaction.

(12) **Eligible Contract Participant.** Each party represents to the other party (which representation will be deemed to be repeated by each party on each date on which a Transaction is entered into) that it is an "eligible contract participant", as defined in the Commodity Futures Modernization Act of 2000.

(13) **Recording of Conversations.** Each party (i) consents to the recording of telephone conversations between the trading, marketing and other relevant personnel of the parties and their Affiliates in connection with this Agreement or any potential Transaction, (ii) agrees to obtain any necessary consent of, and give any necessary notice of such recording to, its relevant personnel and (iii) agrees, to the extent permitted by applicable law, that recordings may be submitted in evidence in any Proceedings.

## PART 5
### Other Provisions

(1) **Waiver of Jury Trial.** Each party waives, to the fullest extent permitted by applicable law, any right it may have to a trial by jury in respect of any suit, action or proceeding relating to this Agreement or any Credit Support Document. Each party (i) certifies that no representative, agent or attorney of the other party or any Credit Support Provider has represented, expressly or otherwise, that such other party would not, in the event of such a suit, action or proceeding, seek to enforce the foregoing waiver and (ii) acknowledges that it and the other party have been induced to enter into this Agreement and provide for any Credit Support Document, as applicable, by, among other things, the mutual waivers and certifications in this Section.

(2) **ISDA Definitions.** Reference is hereby made to the 2000 ISDA Definitions (the "2000 Definitions") and the 1998 FX and Currency Option Definitions (the "FX Definitions") (collectively the "ISDA Definitions") each as published by the International Swaps and Derivatives Association, Inc., which are hereby incorporated by reference herein. Any terms used and not otherwise defined herein which are contained in the ISDA Definitions shall have the meaning set forth therein.

(3) **Scope of Agreement.** Notwithstanding anything contained in this Agreement to the contrary, any transaction (other than a repurchase transaction, reverse repurchase transaction, buy/sell-back transaction or securities lending transaction) which may otherwise constitute a "Specified Transaction" (without regard to the phrase "which is not a Transaction under this Agreement but" in the definition of "Specified Transaction") for purposes of this Agreement which has been or will be entered into between the parties shall constitute a "Transaction" which is subject to, governed by, and construed in accordance with the terms of this Agreement, unless any Confirmation with

respect to a Transaction entered into after the execution of this Agreement expressly provides otherwise.

(4) **Inconsistency.** In the event of any inconsistency between any of the following documents, the relevant document first listed below shall govern: (i) a Confirmation; (ii) the Schedule (iii) the ISDA Definitions; and (iv) the printed form of ISDA Master Agreement. In the event of any inconsistency between provisions contained in the 2000 Definitions and the FX Definitions, the FX Definitions shall prevail.

(5) **Loan Agreement.** Until all of Party B's obligations (whether absolute or contingent) under this Agreement have been satisfied in full, Party B will at all times perform, comply with and observe all covenants and agreements of the Loan Agreement applicable to it, which covenants and agreements, together with related definitions and ancillary provisions, are hereby incorporated by reference (mutatis mutandis) and, for the avoidance of doubt, shall be construed to apply hereunder for the benefit of Party A as though (i) all references therein to the party or parties making loans, extensions of credit or financial accommodations thereunder or commitments therefor ("Financings") were to Party A and (ii) to the extent that such covenants and agreements are conditioned on or relate to the existence of such Financings or Party B having any obligations arising out of or in connection therewith, all references to such Financings or obligations were to Party B's obligations under this Agreement.

"Loan Agreement" means the Credit Agreement and Guaranty Agreement, dated as of April 3, 2007 by and among Party B and Certain Subsidiaries of Party B as Guarantors, the Lenders party thereto, and Silver Pointe Finance, LLC as Administrative Agent, Collateral Agent and Lead Arranger, as amended, supplemented or otherwise modified from time to time; provided that if the obligations under the Loan Agreement are paid in full, the Loan Agreement is otherwise terminated or cancelled, Loan Agreement means the Loan Agreement as it existed immediately prior to such event. Capitalized terms defined therein and not otherwise defined herein shall have the meanings assigned in the Loan Agreement.

(6) **ACH Authorization.** Party B hereby authorizes Party A to initiate debit and credit entries via ACH to/from the account specified in the Confirmation for each Transaction. This authorization shall remain in full force and effect until Party A has received written notification from Party B of its termination in such time and in such manner as to afford Party A and Party B's depository financial institution a reasonable opportunity to act on it.

(7) **Independent Obligations.** (i) Although Party B may be entering into one or more Transactions under this Agreement to hedge against the interest expense of, or other risk associated with, an existing or future loan or other financing, this Agreement and each Transaction shall be an independent obligation of Party B separate and apart from any such loan or other financing, and therefore: (A) each party's obligations under this Agreement or any Transaction shall not be contingent on whether any loan or other financing closes, is outstanding or is repaid, in whole or in part, at any time; (B) subject to paragraph (ii) below, any repayment, acceleration, satisfaction, discharge or release of, and any amendment, modification or waiver with respect to, any loan or other financing, whether in whole or in part, at any time, shall not in any way affect this Agreement, any

7

Transaction or either party's obligations under this Agreement or any Transaction; (C) payments that become due under this Agreement or any Transaction shall be due whether or not (1) the Notional Amount of any Transaction at any time is different from the principal amount of any loan or other financing, (2) the Termination Date of any Transaction occurs before or after the maturity date of any loan or other financing, or (3) any other terms of any loan or other financing are different from the terms of this Agreement or any Transaction; (D) nothing in this Agreement or in any Confirmation is intended to be, nor shall anything herein or therein be construed as, a prepayment penalty, charge or premium for purposes of any loan or other financing, nor shall any terms of any loan or other financing be deemed a waiver of or otherwise impair any amount due or that may become due under this Agreement or under any Transaction; (E) if Party B at any time receives from Party A (or any of its affiliates) any payoff statement or other written statement regarding any loan or other financing, nothing in such statement shall be deemed to apply to this Agreement or any Transaction except as otherwise expressly provided in that statement and then only to the extent so provided; (F) the terms under which any Transaction may be terminated early are set forth in this Agreement (including any Confirmation of such Transaction), and any early termination of a Transaction other than pursuant to the provisions of this Agreement (including any such Confirmation) is subject to mutual agreement of the parties confirmed in writing, the terms of which may require one party to pay an early termination fee to the other party based upon market conditions prevailing at the time of early termination; and (G) if at any time any existing or future collateral or other credit support secures or otherwise supports both this Agreement (or any Transaction hereunder) and any loan or other financing (whether this Agreement or any Transaction hereunder is specifically identified in the collateral or credit support documents, or instead is referred to therein generically), then such collateral or other credit support shall continue to secure or otherwise support Party B's obligations under this Agreement (or any Transaction hereunder) until such time as all such obligations of Party B are completely satisfied notwithstanding any repayment, acceleration, satisfaction, discharge or release of any such loan or other financing.

(ii) Nothing in paragraph (i) above shall be construed as impairing or limiting: any set-off rights; any cross default, credit support default or other provisions contained in this Agreement or any Confirmation to the extent such provisions refer to any repayment or acceleration of any loan or other financing; any rights or obligations under any Credit Support Documents; or any obligations of Party B under any covenant incorporated in this Schedule by reference from any loan or other financing (provided that any amendment, modification or waiver executed and delivered by Party A in writing with respect to any such covenant shall be deemed to apply hereunder to that covenant as so incorporated unless otherwise expressly provided in such writing).



Please confirm your agreement to the terms of the foregoing Schedule by signing below.

JPMORGAN CHASE BANK,
NATIONAL ASSOCIATION

By: _____
Name: Eric W. ~~~~~
Title: Vice President

HOSTWAY CORPORATION

By: _____
Name: D. K. Erdert
Title: Chief Financial Officer